CHICAGO & NORTH WESTERN RAILWAY COMPANY and others, Respondents, v. LA FOLLETTE, Attorney General, and others, Appellants.

*April 28—June 1, 1965.*

506

508

510

For the appellants the cause was argued by *Beatrice Lampert,* assistant attorney general, with whom on the briefs was *Bronson C. La Follette,* attorney general.

For the respondents there was a brief by *La Follette, Sinykin, Doyle & Anderson* and *James E. Doyle,* all of Madison, and oral argument by *James E. Doyle.*

A brief *amicus curiae* was filed by *Wheeler, Van Sickle, Day & Goodman* and *Roland B. Day,* all of Madison, for the Brotherhood of Railroad Trainmen.

A brief *amicus curiae* was also filed by *Ralph M. Hoyt* of Milwaukee, attorney, and *Harold C. Heiss* of Cleveland, Ohio, of counsel, for the Brotherhood of Locomotive Firemen & Enginemen.

BEILFUSS, J. The genesis of the instant litigation arose when the railroads and the unions exchanged "notices" pertaining to crews and work rules. Negotiations were had without success. A national strike was imminent. A presidential fact-finding commission was appointed. Public Law 88–108 (77 Stat. 132, 45 USCA, sec. 157 (1964 Supp.)) was enacted. Arbitration was ordered with a binding award to be made in respect to the fireman issue and the crew consist of train and engine crews. The *job* of fireman was eliminated, for the most part; the employment of *individuals* was to be terminated gradually. The crew-consist issue was remanded for local negotiations.[1]

Two issues are presented. (1) Has Congress pre-empted the subject of full-crew regulation? And, (2) does the complaint state facts sufficient to constitute a cause of action?

*Pre-emption.*

The question of federal pre-emption of this particular area of local concern is one of subject-matter jurisdiction. Respondents have pleaded Public Law 88–108; they have not pleaded pre-emption. The issue was discussed in the briefs. Suffice it to say, the issue is properly raised at any time, or on appeal for the first time. *Moreland Corp. v. Retail Store Employees Union* (1962), 16 Wis. (2d) 499, 114 N. W. (2d) 876.

However, before pre-emption will be found to exist, that intention of Congress must be clearly manifested. *Minne-*

---

[1] A review of this factual background is set forth in *Brotherhood of Locomotive Firemen & Enginemen v. Chicago, B. & Q. R. Co.* (D. C., D. C. 1964), 225 Fed. Supp. 11, affirmed 331 Fed. (2d) 1020, certiorari denied 377 U. S. 918, 84 Sup. Ct. 1181, 12 L. Ed. (2d) 187; *In re Certain Carriers* (D. C., D. C. 1964), 229 Fed. Supp. 259; *Chicago, Rock Island & P. R. Co. v. Hardin* (D. C. Ark. 1965), 239 Fed. Supp. 1; *New York Central R. Co. v. Lefkowitz* (1965), 46 Misc. (2d) 68, 259 NY Supp. (2d) 76.

*apolis, St. P. & S. S. M. R. Co. v. Railroad Comm.* (1924), 183 Wis. 47, 197 N. W. 352; *Florida Lime & Avocado Growers v. Paul* (1963), 373 U. S. 132, 83 Sup. Ct. 1210, 10 L. Ed. (2d) 248, rehearing denied 374 U. S. 858, 83 Sup. Ct. 1861, 10 L. Ed. (2d) 1082; *International Union v. Wisconsin Employment Relations Board* (1949), 336 U. S. 245, 69 Sup. Ct. 516, 93 L. Ed. 651, rehearing denied 336 U. S. 970, 69 Sup. Ct. 935, 93 L. Ed. 1121; *Missouri Pacific R. Co. v. Norwood* (1931), 283 U. S. 249, 51 Sup. Ct. 458, 75 L. Ed. 1010; *Chicago, Rock Island & P. R. Co. v. Hardin, supra; New York Central R. Co. v. Lefkowitz, supra.* The ultimate question is: Does the application of state law frustrate the purpose of the federal legislation? *Teamsters Union v. Morton* (1964), 377 U. S. 252, 84 Sup. Ct. 1253, 12 L. Ed. (2d) 280. See also *Teamsters Union v. Oliver* (1959), 358 U. S. 283, 79 Sup. Ct. 297, 3 L. Ed. (2d) 312.

The clear manifestation of a purpose to pre-empt state legislation should be considered in light of the rule that the states have considerable latitude respecting safety regulation of interstate commerce in the exercise of their police powers. Thus, it was said in *Terminal Asso. v. Trainmen* (1943), 318 U. S. 1, 8, 63 Sup. Ct. 420, 87 L. Ed. 571:

"As to both classes of runs, the effect of the order is in some measure to retard and increase the cost of movements in interstate commerce. This is not to say, however, that the order is necessarily invalid. . In the absence of controlling federal legislation this Court has sustained a wide variety of state regulations of railroad trains moving in interstate commerce having such effect." [2]

[2] See also *California v. Thompson* (1941), 313 U. S. 109, 116, 61 Sup. Ct. 930, 85 L. Ed. 1219, wherein various cases upholding regulations of interstate commerce by the states are collected. In that case the court said: "If there is authority in the state, in the exercise of its police power, to adopt such regulations affecting interstate transportation, it must be deemed to possess the power to regulate the negotiations for such transportation where they

The pertinent Wisconsin and federal statutes are set forth as follows:

"192.25 (2) *Freight Crew.* No railroad operating more than 10 miles of route shall run outside of yard limits any freight train propelled by any form of energy of 3 cars or more with less than a full train crew consisting of an engineer, a fireman, a conductor and 2 brakemen. . . .

"(4) *Engine Crew.* It is unlawful for any railroad company in the state of Wisconsin operating more than 10 miles of route to move over its main line outside of yard limits an engine propelled by any form of energy with no cars attached with less than a full crew consisting of one engineer, one fireman and one pilot; said pilot to have had not less than 3 years' experience in train or engine service and who shall have passed standard examination on book of rules and has qualified as a conductor or an engineer; except that such pilot need not be used if one is not available when it is necessary to run engine to the relief of an injured person or to raise a blockade of traffic.

"(4a) *Extension Full Train Crew Requirement.* It shall be unlawful for any railroad company in the state of Wisconsin to operate any locomotive, locomotive crane, pile driver, steam shovel, cut widener, gas-electric motor car, or gas-electric switch engine or any other similar self-propelled vehicle propelled by any form of energy whether properly denominated an engine or locomotive, when used on its tracks for the purpose of switching cars, with less than a full train crew consisting of one engineer, one fireman, one conductor and two helpers. Said train crew shall be selected from seniority lists of train and locomotive engine employes on the division of the railroad on which the crew is to be worked."

Public Law 88–108, 77 Stat. 132, 45 USCA, sec. 157 (1964 Supp.), provides as follows:

affect matters of local concern which are in other respects within state regulatory power, and where the regulation does not infringe the national interest in maintaining the free flow of commerce and in preserving uniformity in the regulation of the commerce in matters of national concern."

"Sec. 1. [Settlement of disputes]. That no carrier which served the notices of November 2, 1959, and no labor organization which received such notices or served the labor organization notices of September 7, 1960, shall make any change except by agreement, or pursuant to an arbitration award as hereinafter provided, in rates of pay, rules, or working conditions encompassed by any of such notices, or engage in any strike or lockout over any dispute arising from any of such notices. Any action heretofore taken which would be prohibited by the foregoing sentence shall be forthwith rescinded and the status existing immediately prior to such action restored. . . .

"Sec. 3. [Decision of board]. . . . The arbitration board shall make a decision, pursuant to the procedures hereinafter set forth, as to what disposition shall be made of those portions of the carriers' notices of November 2, 1959, identified as 'Use of Firemen (Helpers) on Other Than Steam Power' and 'Consist of Road and Yard Crews' and that portion of the organizations' notices of September 7, 1960, identified as 'Minimum Safe Crew Consist' and implementing proposals pertaining thereto. The arbitration board shall incorporate in such decision any matters on which it finds the parties were in agreement, shall resolve the matters on which the parties were not in agreement, and shall, in making its award, give due consideration to those matters on which the parties were in tentative agreement. Such award shall be binding on both the carrier and organization parties to the dispute and shall constitute a complete and final disposition of the aforesaid issues covered by the decision of the board of arbitration.

"Sec. 4. [Award]. . . . The award shall continue in force for such period as the arbitration board shall determine in its award, but not to exceed two years from the date the award takes effect, unless the parties agree otherwise. . . .

"Sec. 6. [Collective bargaining for issues not arbitrated]. The parties to the disputes arising from the aforesaid notices shall immediately resume collective bargaining with respect to all issues raised in the notices of November 2, 1959, and September 7, 1960, not to be disposed of by arbitration under section 3 of this joint resolution and shall exert every

reasonable effort to resolve such issues by agreement. The Secretary of Labor and the National Mediation Board are hereby directed to give all reasonable assistance to the parties and to engage in mediatory action directed toward promoting such agreement.

"Sec. 7. [Considerations affecting award; enforcement]. (a) In making any award under this joint resolution the arbitration board established under section 2 shall give due consideration to the effect of the proposed award upon adequate and safe transportation service to the public and upon the interests of the carrier and employees affected, giving due consideration to the narrowing of the areas of disagreement which has been accomplished in bargaining and mediation. . . .

"Sec. 8. [Expiration date]. This joint resolution shall expire one hundred and eighty days after the date of its enactment, [Aug. 28, 1963], except that it shall remain in effect with respect to the last sentence of section 4 for the period prescribed in that sentence."

For the reasons which follow, we conclude the state full-crew laws have not been pre-empted.

The following appears in 109 Congressional Record 16122 (Aug. 28, 1963) :

"Mr. Harris. This issue was raised in the course of the hearings before the committee. Questions were asked of the various people representing management and the labor industry and witnesses representing the labor brotherhoods, the employees' representatives, and the Secretary of Labor. It was made rather clear in the course of the hearings that it would in no way affect the provisions of State laws. The committee in executive session discussed the question and concluded that it was not the intent of the committee in any way to affect State laws. On page 14 of the committee report we included, in order that this history might be made, this language:

"The committee does not intend that any award made under this section may supersede or modify any State law relating to the manning of trains.

"In a footnote on page 112 of the hearings before the committee on House Joint Resolution 565, the original bill, there is a discussion of the legal basis for State 'full-crew' laws, and a citation to several Supreme Court decisions upholding these laws, such as *Missouri Pacific R. R. Co. v. Norwood* (283 U. S. 249).

"Therefore, since this bill does not mention the subject of State laws, and since, as the committee report shows, we do not intend to affect these laws, I am confident they are not affected by the bill.

"I think that is about as clear as we can make it."

The award of the arbitration board is as much a part of the law of the land as is the statute. The statute commands a study and award be made in respect to the fireman issue. That such a study and award were made does not *ipso facto* pre-empt state law. Note that the statute and the award expire by the terms of the statute.

The award itself provides:

"II. Use of Firemen (Helpers) on Other Than Steam Power
"Part A—Saving Clause
"A (1) All agreements, rules, regulations, interpretations and practices, however established, with respect to the employment of firemen (helpers) shall continue undisturbed except as modified by the terms of this Award."

The award makes reference to the matter of safety. The matter of crew consist of trains and engines was left for local negotiation. Guidelines were set forth, one of which is, "State, county, or municipal regulations applicable with respect to highway, street, road, railroad, or other crossings or intersections." This guideline is not squarely on point but it does reflect appreciation of local safety rules.

The opinion of the neutral members of the arbitration board states, at page 4:

"The provisions of our award are explained in general terms in this opinion, without reference to certain refine-

ments spelled out in the award. In the event of any inadvertent conflict between the explanation given in this opinion and the precise language of the award, the latter is, of course, intended to govern."

The award is silent on the question of pre-emption of the full-crew laws. The opinion should be read as explanatory of the award.

The opinion rejected the idea that there will be a wholesale elimination of personnel from the jobs which have been terminated. Several reasons were given. One is that the award provides for gradual elimination of the employees. And, further, ". . . a number of States, by law or administrative regulation, require the use of firemen in road freight or yard service."

With respect to the crew-consist issue, the opinion states:

"It has been explained earlier in this opinion that the size of road and yard crews in other than engine service has never been the subject of a national rule in the railroad industry. The consist of these crews, involving primarily helpers and road brakemen, has been determined generally by local rules, practices, *state full crew laws,* or regulations issued by State Public Utility Commissions. Only a relatively few carriers are unrestricted in determining the size of crews, and it is doubtful if even they have complete freedom to change crew size as they wish. It is clear from the evidence before us that the myriad of local arrangements has led to numerous inconsistencies in the manning of crews. It is equally clear that some of the existing rules, originating as they did more than a half-century ago, are anachronistic and do not reflect the present state of railroad technology and operating conditions." (Emphasis added.)

The board was directed to pass directly on the firemen and train-crew issues. *Brotherhood of Locomotive Firemen & Enginemen v. Chicago, B. & Q. R. Co., supra.* It did not, however, pre-empt the field, as shown by the award and the opinion of the neutral members.

There is a split of authority on the pre-emption question.[3]

In *Florida Lime & Avocado Growers v. Paul, supra,* it was said that if physical compliance with both the state and federal law is impossible, state law is pre-empted. Such is not the case here. In the *Florida Lime & Avocado Growers Case* the court stated the standards for determining when there is pre-emption. Does state law operate as an " 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress?' " The court said at page 142:

"The test of whether both federal and state regulations may operate, or the state regulation must give way, is whether both regulations can be enforced without impairing the federal superintendence of the field, not whether they are aimed at similar or different objectives."

There is no pre-emption, as the court said:

". . . in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other

---

[3] In *New York Central R. Co. v. Lefkowitz, supra,* state law was held not pre-empted. The court said: "I do not believe that the language employed in the statute indicates a purpose to permit the Arbitration Board to determine that locomotives and trains may be manned, in states which had enacted full crew laws to eliminate the hazards of railway operations within their own borders, with smaller crews than those prescribed by such laws. Certainly, if there is such a purpose, it is not clearly expressed. On the contrary, both the language employed and the legislative history of the statute appear to evidence an intent not to interfere, in any way, with the operation of the state laws. Neither does the award of the arbitrators, when read in the light of its expressed purpose, evidence an intent to permit locomotives and trains to be manned in violation of state statutes. Unquestionably, as has been stated, the public law and the award made thereunder are part of the law of the land." In *Chicago, Rock Island & P. R. Co. v. Hardin, supra,* a three-judge federal court held the state law was pre-empted. The court was divided. The minority opinion stated at page 30: "Thus contrary to the view of my brothers, I can find nothing in Public Law 88–108 or the arbitration award which manifests a Congressional intent to pre-empt the field covered by the Arkansas statutes."

conclusion, or that the Congress has unmistakably so ordained."

The well-established rule that states may regulate in this area of safety, the fact that Public Law 88–108 and the award do not clearly manifest an intention to occupy this field warrant the conclusion that our full-crew laws have not been pre-empted. Whether such laws can withstand the challenge from other directions—and the sufficiency of such a challenge—are the next points to be considered.

*The Complaint: The Right to a Judicial Determination As to the Constitutionality of Statutes.*

At the outset, it should be observed that we express no opinion as to the merits of the respondents' case. Nor, on demurrer, are we concerned with whether respondents can prove their allegations at trial. *Merchandising Corp. v. Marine Nat. Exchange Bank* (1960), 12 Wis. (2d) 79, 106 N. W. (2d) 317.

Whether any part of a statute may be upheld is a question of law for the courts. *Stewart v. Stanley* (1941), 199 La. 146, 5 So. (2d) 531. A regulatory statute cannot masquerade as an absolute exercise of police power. It must be reasonable. Whether it transcends the constitution must be decided by the court. *Northern Pacific R. Co. v. Warner* (1950), 77 N. D. 721, 45 N. W. (2d) 196.

A person claiming to be aggrieved by the application of a statute to his particular circumstances is entitled to challenge the constitutional foundation of that statute in our courts. The clear distinction must be understood between the right to a judicial determination as to the statute's constitutionality, and the scope of judicial review which the court will undertake and what effect will be given to the evidence adduced at trial. A fair balance must be struck, in construing pleadings, between the status of a regularly enacted statute and

the onerous burden of invalidating the statute. Proper balancing of the rules of pleading and the right to judicial review promote justice.

There is no dispute as to the rule that,

"All acts of legislative bodies are presumed to be constitutional unless established otherwise by a competent tribunal." *Courtesy Cab Co. v. Johnson* (1960), 10 Wis. (2d) 426, 431, 103 N. W. (2d) 17.

In cases challenging the constitutionality of statutes we do not sit as judges of the merits of the controversy, as is done in other cases. *Borden Co. v. McDowell* (1959), 8 Wis. (2d) 246, 99 N. W. (2d) 146. We will not weigh the relative merits of this legislation. Courts are not concerned with the overall merits or wisdom of statutes. *State v. Dried Milk Products Co-operative* (1962), 16 Wis. (2d) 357, 114 N. W. (2d) 412; *State v. Ross* (1951), 259 Wis. 379, 48 N. W. (2d) 460. But, the court does become judicially concerned where the statute "clearly contravenes some constitutional provision." *Thielen v. Metropolitan Sewerage Comm.* (1922), 178 Wis. 34, 189 N. W. 484; *Knoll v. Shaler* (1923), 180 Wis. 66, 192 N. W. 399.

We are obligated only to weigh statutes on the scales of reasonableness. See *State v. Redmon* (1907), 134 Wis. 89, 114 N. W. 137. The exercise of state police power must rest upon reasonable grounds. The means adopted thereby must be a reasonable accomplishment of that purpose. *Wisconsin Telephone Co. v. Milwaukee* (1936), 223 Wis. 251, 270 N. W. 336. In *Nebbia v. New York* (1934), 291 U. S. 502, 54 Sup. Ct. 505, 78 L. Ed. 940, it is said that the police power must be such that the "end shall be accomplished by methods consistent with due process." Further, that "the means selected shall have a real and substantial relation to the object sought to be attained." The burden on the challenger is heavy. All legislative acts are constitutional

unless it appears they are unconstitutional beyond a reasonable doubt. *State ex rel. McCormack v. Foley* (1962), 18 Wis. (2d) 274, 118 N. W. (2d) 211.

Whether the scale will be tipped on the side of constitutional mandates which condemn statutory inroads into constitutional sanctuaries or on the side of the presumption of constitutionality of legislative enactments is ultimately resolved by the answer to this question: Is the legislative choice without a reasonable basis? *Onsrud v. Kenyon* (1941), 238 Wis. 496, 300 N. W. 359.[4]

A narrow view of what are ultimate facts or conclusions of law must not be indulged in when a statute is challenged. Constitutional rights are too fundamental—too important—not to be considered by this court. (A complaint must nevertheless meet minimum requirements for pleadings.) We should not lose sight of the function of courts in our society. That a statute will be upheld if there is any reasonable basis for it necessarily implies a determination of that very question, with the proviso that the court will not weigh the evidence. Our duty was stated in *State ex rel. Attorney General v. Cunningham* (1892), 81 Wis. 440, 477, 51 N. W. 724:

"How, then, can this court declare what the statutory law is, without first determining whether it conflicts with the constitution? Without this power, this court would have no judicial functions whatever, and would be a useless appendage of the government. . . .

[4] Thus, the court does not resolve constitutional questions upon "fairly debatable issues." *Ferguson v. Skrupa* (1963), 372 U. S. 726, 83 Sup. Ct. 1028, 10 L. Ed. (2d) 93. All doubts are resolved in favor of the legislation. *State ex rel. Thomson v. Giessel* (1953), 265 Wis. 558, 61 N. W. (2d) 903. So, when it is reasonably possible to uphold the validity of a statute it will be done. *United Gas, Coke & Chemical Workers v. Wisconsin Employment Relations Board* (1949), 255 Wis. 154, 38 N. W. (2d) 692. "Good intentions" do not prevent the court from inquiring whether the statute transcends constitutional limitations. *Bonnett v. Vallier* (1908), 136 Wis. 193, 116 N. W. 885.

" 'By a course of judicial decisions reaching from the earliest history of American government to the present day, without a dissenting voice, it has been adjudged that courts of justice have the right and are in duty bound to test every law by the constitution as the fundamental and paramount law of the land, governing all derivative power and the exercise thereof. . . . To contend that this is not so would be to assert that the legislative branch of the government is supreme in its authority.' . . .

" 'Whether the legislature has transcended its power and passed an act in conflict with the constitution is essentially a question of law, and must necessarily be passed upon by the courts.' " [5]

It is clear that the court has the obligation to take judicial notice, where it can, to uphold a statute. *Ritholz v. Johnson* (1944), 244 Wis. 494, 12 N. W. (2d) 738. And, it is the duty of the attorney general to appear on behalf of the people of this state to show why the statute is constitutional. Sec. 269.56 (11), Stats. But, where the court has no adequate knowledge of the facts pertaining to the subject of the lawsuit, nor can it satisfactorily inform itself of such facts, a trial should be had. *Ritholz v. Johnson, supra.* Whether a trial will be had, or judicial notice taken, is a matter of discretion reposing in this court. *Associated Hospital Service v. Milwaukee* (1961), 13 Wis. (2d) 447, 109 N. W. (2d) 271.

---

[5] In *Marbury v. Madison* (1803), 5 U. S. 49, 58 (1 Cranch 137, 163), it is said: "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection. In Great Britain the King himself is sued in the respectful form of a petition, and he never fails to comply with the judgment of his court." In *State v. Redmon, supra,* at page 106, it is said: ". . . all legislative regulations of human affairs interfering with personal liberty or other private rights, to be legitimate, tested by constitutional limitations, must be reasonably for the public benefit." And, "Law can never legitimately go clearly beyond the boundaries of reason."

In *State v. Chippewa Cable Co.* (1963), 21 Wis. (2d) 598, 602, 124 N. W. (2d) 616, it is said:

"The type of issue presented by an allegation that a statute violates the constitution, and a denial thereof or demurrer thereto, does not fit exactly into the usual classification of issues as fact or law. Primarily, it is an issue of law, but because of principles controlling judicial review of legislative acts, the issue often is: Whether there may be reasonably conceived in the mind of the court facts which the legislature could have deemed to exist and which would form a reasonable basis upon which the statute may constitutionally rest.

"The process of judicial notice may be adequate to resolve the question under some circumstances, but particularly where economic regulation is involved, it may be necessary for a court to make a judicial investigation of facts outside the ordinary scope of judicial notice. . . .

"It is clear, however, that where judicial notice can be taken of facts sufficient to form a reasonable basis upon which the statute may constitutionally rest, the assembling of further facts by way of trial could serve no useful purpose, and the *Ritholz* procedure need not be followed."

The challenge raised by the respondents is of sufficient magnitude to warrant a judicial inquiry. Certainly, the studies made by the boards on the railroad issues, raise sufficient doubt about the entire subject of full-crew legislation. Whether facts will be presented at a trial to elevate that doubt to prove that there is no reasonable basis for the statute must abide the result of a hearing.

Appellants argue that respondents are required "to negate every conceivable basis which may reasonably support the statute's constitutionality," citing *State v. Texaco* (1961), 14 Wis. (2d) 625, 111 N. W. (2d) 918. In that case it was the opponent of the statute, Texaco, which demurred thereby attempting to preclude a full hearing on the merits. There, this court affirmed the order of the trial court which overruled the demurrer. Texaco does not apply any rule

other than there must be a showing of no reasonable basis for a statute. For the pleader to set forth the minute details of proof in the pleading is neither required nor proper pleading.

The complaint fully and fairly advises the appellants and the court of what is claimed. *Handy v. Holland Furnace Co.* (1960), 11 Wis. (2d) 151, 105 N. W. (2d) 299; *Aldrich v. Skycoach Air Lines Agency* (1954), 266 Wis. 580, 64 N. W. (2d) 199; *Wauwatosa v. Milwaukee* (1954), 266 Wis. 59, 62 N. W. (2d) 718. The issue is very narrow in this case; the proof, however, might have to be very broad.

Allegations of unconstitutionality without supporting factual allegations are conclusions of law and improper. See *Bieser v. Woods* (1941), 347 Mo. 437, 147 S. W. (2d) 656; *Juengel v. Glendale* (Mo. 1942), 161 S. W. (2d) 408; *Springfield v. Kable* (1940), 306 Ill. App. 616, 29 N. E. (2d) 675. In *Laun v. Kipp* (1914), 155 Wis. 347, 355, 145 N. W. 183, it is said:

"Technical accuracy in statements of fact is not required. Facts need not, necessarily, be expressly alleged. No very narrow idea is to be indulged in as to what is a legal conclusion and what a matter of fact, or mixed law and fact. . . . All reasonable doubts are to be resolved in favor of the pleader. All facts expressly stated and all reasonably inferable therefrom, giving to the language of the pleading the broadest meaning which it will reasonably bear, are to be regarded as sufficiently alleged to meet any challenge for insufficiency."

In its simplest form the complaint alleges that firemen are unnecessary; that the requirement that firemen be part of the crew in freight trains and in yard service bears no reasonable relationship to safety, and results in an unreasonable financial burden upon respondents; and, therefore, the statutes which require under the circumstances firemen violate enumerated sections of the state and federal constitutions. If respondents are able to sufficiently demonstrate that firemen

are not needed and serve no useful purpose, and their function bears no relation to the safety of the crew or the public —within the bounds of reason—Query: Have not the respondents met their burden of proof?

It would seem that the allegations that firemen perform no necessary function in the operation of the train and that their presence in the crew has no relation to safety represent an "ultimate collection" of those facts which the respondents must prove. What was said in *Larson v. Lester* (1951), 259 Wis. 440, 443, 49 N. W. (2d) 414, is apposite:

"The statement may be a conclusion of law, but this court has said:

" '. . . Where the ultimate fact essential to a cause of action is brought into existence by a series of detail acts and events, it is entirely competent and sufficient to plead those detail acts according to their legal effect, . . .' . . . .

" 'Matters of mixed law and fact, the ultimate of which is, in a broad sense, a fact, may be pleaded according to their legal effect . . . every reasonable intendment must be indulged in in favor of the pleading.' . . ."

*Thauer v. Gaebler* (1930), 202 Wis. 296, 232 N. W. 561, was an action by a minority shareholder on behalf of defendant corporation to require other defendants to account for and repay certain moneys. Defendants claim the allegations that certain increases in salaries to the officers are "excessive and unreasonable," or "excessive and unlawful," are but conclusions of law. The court said they are "really statements of mixed conclusions of fact and law, the ultimate of which is, in a broad sense, a conclusion of fact, and consequently may be pleaded according to their legal effect." In *State ex rel. Week v. State Board of Examiners* (1947), 252 Wis. 32, 30 N. W. (2d) 187, it appears that the general allegation that certain portions of a statute are in violation of the Fourteenth amendment by depriving the party of his right to property without due process of law are sufficient.

Appellants argue that the complaint does not allege anything to take it out of the three Arkansas full-crew cases, especially the *Norwood Case.*[6]

Full-crew laws are intended for the safety of the public, of the passengers, and employees of the railroad. *Beal v. Missouri Pacific R. Corp. in Nebraska* (8th Cir. 1940), 108 Fed. (2d) 897; see also *Union Pacific R. Co. v. Anderson* (1941), 167 Or. 687, 120 Pac. (2d) 578; *Bressler v. Chicago & N. W. R. Co.* (1950), 152 Neb. 732, 42 N. W. (2d) 617; *New York Central R. Co. v. Public Utilities Comm.* (1953), 160 Ohio St. 236, 115 N. E. (2d) 842. Whether the basis for these laudable purposes exists under present conditions is another question.

Full-crew laws are penal and in derogation of the common law. *State v. Chicago & N. W. R. Co.* (1931), 205 Wis. 252, 237 N. W. 132; *Brotherhood of Railroad Trainmen v. Illinois Central R. Co.* (1962), 243 Miss. 851, 138 So. (2d) 908; *Bressler v. Chicago & N. W. R. Co., supra.*

The Arkansas full-crew cases are not controlling. The net effect of the United States supreme court's decisions were that the subject of full crews is a proper one for state regulation. The first two cases were decided upon a record. In the first case the court said the laws were enacted for the protection of those engaged in interstate commerce. The court did, however, express its doubt as to the necessity of the law.

In the second case the court held that, as in the first case, the testimony did not establish that the statute was an arbitrary exercise of power.

---

[6] *Chicago, Rock Island & P. R. Co. v. Arkansas* (1911), 219 U. S. 453, 31 Sup. Ct. 275, 55 L. Ed. 290; *St. Louis & Iron M. R. v. Arkansas* (1916), 240 U. S. 518, 36 Sup. Ct. 443, 60 L. Ed. 776; and *Missouri Pacific R. Co. v. Norwood* (1931), 283 U. S. 249, 51 Sup. Ct. 458, 75 L. Ed. 1010.

In the third case the pleadings alleged changing circumstances and improvements in the safe operation of the trains. The court said (at p. 255):

"The burden is on the plaintiff by candid and direct allegations to set forth in its complaint facts sufficient plainly to show the asserted invalidity. . . .

"There is no showing that the dangers against which these laws were intended to safeguard employees and the public no longer exist or have been lessened by the improvements in road and equipment or by the changes in operating conditions there described. And, for aught that appears from the facts that are alleged, the same or greater need may now exist for the specified number of brakemen and helpers in freight train and switching crews. . . . There is no statement as to present efficiency of switching crews compared with that when the 1913 Act was passed, but it reasonably may be inferred that larger cars and heavier loading of today make for a lower switching expense per car or ton. While cost of complying with state laws enacted to promote safety is an element properly to be taken into account in determining whether such laws are arbitrary or repugnant to the due process clause of the Fourteenth Amendment, . . . there is nothing alleged in that respect which is sufficient to distinguish this case from those in which we have upheld the laws in question."

Conditions may have changed sufficiently to warrant reexamination of Wisconsin law.[7]

We think the reasoning in *Pennsylvania R. Co. v. Driscoll* (1938), 330 Pa. 97, 104, 198 Atl. 130, is most appropriate to this case. The opinion is long and will not be

---

[7] The *Norwood Case, supra,* followed relatively soon after the second Arkansas full-crew case. That the court was not impressed with the possibility of changed circumstances is understandable. *Norwood* antedates the "age of dieselization," of which we take judicial notice. This notwithstanding the New York supreme court in *New York Central R. Co. v. Lefkowitz, supra,* just upheld the state full-crew laws. The opinion of the New York trial court, while entitled to due respect, cannot preclude us from making our own independent evaluation of conditions as they exist today in Wisconsin.

quoted at length. The following is pertinent to our discussion:

"But this challenge against the constitutionality of the Full Crew Act depends entirely on facts. We cannot determine whether the Act is confiscatory, unreasonable and arbitrary, or whether it does not reasonably tend to promote safety, until facts are presented to show the existence of any of these effects. Prima facie, the Act is valid and must be so considered by us until its invalidity appears. Whether the measure promotes safety, or has a tendency to do so, must indubitably turn on facts and circumstances regarding that subject, and the relation which the provisions of the Act bear to safety. An analysis of the statute and the statute's requirements is necessary; we must compare these with the incidents of transportation, including the causes which create the need for safeguards, and the methods now employed to obtain the safety of the public and employees. When the result is reached, if it is found the statutory protection is of such slight consequence, or is so incidental as to cause the provisions of the Act to be wholly impractical, and not in promotion of the safety it seems to strive for, then its operation would be unreasonable and arbitrary. This situation could only be developed by evidence. In these circumstances, of course, it would be error to refuse to hear evidence. [Cases cited.]"

The *Pennsylvania R. Co. v. Driscoll Case* (1939), 336 Pa. 310, 336, 9 Atl. (2d) 621, was a decision on the merits. The full-crew law was held invalid. There was a 7,000 page record and 282 findings of fact. The court said the fact that the legislature has promulgated such regulations by its own general statute does not exempt them from judicial review. Further, the court said:

"What impressd us most was the highly speculative possibility of the danger of accidents alleged to exist. The resultant effectiveness of the Act under these circumstances could only be out of all reasonable proportion to the cost involved, . . ."

Respondents argue that *Southern Pacific Co. v. Arizona* (1945), 325 U. S. 761, 65 Sup. Ct. 1515, 89 L. Ed. 1915,

is on point in respect to the issue of undue burden upon interstate commerce. It is not. Enough has been said on this point earlier in this opinion.[8] As to the Arizona case, it is sufficient to say that the record made it abundantly clear that the Arizona Train Limit Law (which regulated the length of trains) substantially impaired the operation of interstate railroads. The regrouping of trains, made necessary to comply with the state law, had a stultifying effect on the free flow of commerce. Full-crew laws, on the contrary, do not necessarily have that effect.

We conclude that the complaint does state sufficient facts to entitle the respondents to a trial as to the constitutionality of the challenged portions of the "full crew" statutes.

The memorandum decision filed by the trial court directed the "defendants . . . to advise the plaintiff railroads and the court by way of answer what they maintain is a reasonable justification for the imposition of the fireman requirement upon the plaintiffs in *all* of their yard and over-the-road freight operations conducted in Wisconsin."

We disagree as to the learned trial court's placement of the burden of proof. The burden of proof in this case is upon the respondent railroads to show that the statute is unconstitutional. The appellants should be free to choose the method and extent of their defense.

The order entered pursuant to the memorandum decision does not order the appellants to answer in any particular manner, and should be affirmed in this form.

"The subject matter of the instant action is far too vital to be summarily disposed of by demurrer upon inadequate information contained in the record on demurrer." *Gregory III v. Madison Mobile Homes Park* (1964), 24 Wis. (2d) 275, 278, 128 N. W. (2d) 462.

*By the Court.*—Order affirmed.

---

[8] See *Terminal Asso. v. Trainmen, supra,* and footnote 2, *supra.*